IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JOANN MARIA PRESTON,

      Plaintiff,

v.                                CASE NO. 1:17-cv-41-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has answered, (ECF No. 12), and both parties have filed briefs outlining their respective positions. (ECF Nos. 26, 29.) For the reasons discussed below, it is recommended that the Commissioner's decision should be affirmed.

### I. PROCEDURAL HISTORY

Plaintiff filed her application for Title XVI benefits on July 25, 2013, alleging a disability onset date of June 1, 2004, due to anxiety and

depression. (R. 20, 184, 208.) Her application was denied initially on

October 25, 2013, and upon reconsideration on January 13, 2014. (R. 20,

110, 117.) An Administrative Law Judge ("ALJ") held a hearing on October

15, 2015. (R. 38–78.) The ALJ then issued a written decision on December

11, 2015, finding Plaintiff not disabled. (R. 20–32.) The Appeals Council

thereafter denied Plaintiff's request for review. (R. 1–5.) Plaintiff

subsequently appealed the ALJ's decision to this Court. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d

580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. § 416.905 (2015).[1] The

impairment must be severe, making Plaintiff unable to do her previous

work, or any other substantial gainful activity which exists in the national

economy. § 423(d)(2); 20 C.F.R. §§ 416.905–416.911.

    The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. § 416.920. The claimant has the burden of proving the existence of

a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936

F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a

substantial gainful activity, she is not disabled. § 416.920(b). Second, if a

claimant does not have any impairment or combination of impairments

which significantly limit her physical or mental ability to do basic work

activities, then she does not have a severe impairment and is not disabled.

§ 416.920(c). Third, if a claimant's impairments meet or equal an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled. § 416.920(d). Fourth, if a claimant's impairments do not prevent

her from doing past relevant work, she is not disabled. §§ 416.920(e)–(f).

Fifth, if a claimant's impairments (considering her residual functional

capacity ("RFC"), age, education, and past work) prevent her from doing

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

other work that exists in the national economy, then she is disabled. §
416.920(g).

The burden of proof regarding the plaintiff's inability to perform past
relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996,
1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278
(11th Cir. 2001). The burden then temporarily shifts to the Commissioner to
demonstrate that "other work" which the claimant can perform currently
exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

## III.  SUMMARY OF THE RECORD

### A.   Medical Records

#### 1.   Mental

Plaintiff had an individual education plan throughout school. (R.
305–19.) She graduated from high school in 2004 with a special diploma.

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the
> Commissioner. The Commissioner must produce evidence that
> there is other work available in significant numbers in the
> national economy that the claimant has the capacity to
> perform.  In order to be considered disabled, the claimant must
> then prove that he is unable to perform the jobs that the
> Commissioner lists. The temporary shifting of the burden to the
> Commissioner was initiated by the courts, and is not
> specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

(R. 308.)

In June 2013, at the age of twenty-seven, Plaintiff presented to New Horizons of the Treasure Coast ("New Horizons") for a psychological evaluation. (R. 323–40.) Plaintiff said she did not know why she was there. Plaintiff's mother reported that Plaintiff had developmental delays since birth and that she therefore wanted disability for Plaintiff. Plaintiff admitted to some pervasive sadness, apathy, anxiety about being away from her mother, anhedonia,[3] and helplessness. She denied having any auditory or visual hallucinations. She was not on any psychotropic medications at the time. Plaintiff reported spending her adult life with her mother, having no significant adult relationship, and never having a job. She could, however, perform activities of daily living and cook for herself. She had a pet dog and enjoyed art and nail art.

On examination Plaintiff was oriented to person, place, and time. Her appearance, motor activity, flow of thought, affect, and behavior were within normal limits. There was no evidence of psychosis. She demonstrated, however, a reduced amount of speech, stuttering, and a depressed mood. Natalie Keegan, ARNP, assessed Plaintiff with

---

[3] Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedmans Medical Dictionary 42670.

depressive disorder not otherwise specified, assigned a Global
Assessment of Functioning ("GAF") score of 50, and prescribed Prozac.

Plaintiff returned to New Horizons in July 2013 for a follow up with
Bassem El-Bahtity, M.D. (R. 328–29.) Plaintiff reported anhedonia, anxiety,
decreased concentration and mood, and feelings of isolation. She denied
having any auditory or visual hallucinations. Plaintiff's mother reported that
the Prozac had helped "somewhat," and that Plaintiff was "more social."
Plaintiff appeared casual but disheveled, with a constricted, depressed,
dysphoric affect and guarded attitude. Her speech was decreased in
production, slow in rate, and soft in volume. Plaintiff's thought process,
however, was congruent and there was no evidence of hallucinations. Dr.
El-Bahtity assessed Plaintiff with a GAF score of 45 and increased
Plaintiff's Prozac prescription to help alleviate her depression and anxiety.

By September 2013 the Prozac was helping Plaintiff. (R. 370–71.)
Although she still had occasional crying spells and irritability, she was able
to redirect her thinking during those occasions to positive thoughts. She
nonetheless continued to report anhedonia, depressed mood, and
irritability. Plaintiff denied perceptual disturbances and appeared casual
and well-groomed. She was communicative, cooperative, and

demonstrated congruent thought content and thought process. Peter Sanchez, M.D., assessed Plaintiff with a GAF score of 55 and continued her Prozac prescription.

In October 2013 Plaintiff presented to Shanlis Counseling and Assessment ("Shanlis") for a psychological assessment by Christopher J. Beltran, PsyD. (R. 343–46.) Plaintiff reported feeling sad, that she felt like she was not contributing because no one wanted to hire her for "simple stuff" like labor, and that employers would have to be patient with her. She also claimed to forget things that her mother would ask her to do. Plaintiff's typical day included cleaning the house, watching television, and laying on the bed. She claimed to socialize only with her mother, and enjoyed drawing, making key chains, and nail art.

On examination, Plaintiff's vision, speech, hearing, and language were adequate. Her activity level was normal and her affect appropriate. There was no evidence of psychosis and Plaintiff denied suicidal ideation. Plaintiff was oriented, demonstrated good attention, concentration, and judgment, and demonstrated fair reasoning. Her recent and remote memory, however, were poor.

Plaintiff underwent an intelligence assessment, which revealed a

perceptual reasoning score of 88, which was in the low average range. She obtained scores of 74, 71, and 71 in verbal comprehension, working memory, and processing speed, respectively, all of which were in the borderline range. Her full scale IQ of 72 was also in the borderline range. Dr. Beltran assessed Plaintiff with unspecified anxiety disorder and unspecified depressive disorder. Dr. Beltran recommended that Plaintiff undergo therapy to address her mood and anxiety and also receive a vocational evaluation.

Plaintiff returned to New Horizons in November 2013 reporting anhedonia, depressed mood, feelings of isolation, interrupted sleep with bad dreams, and low volition/energy. (R. 372–73.) She also expressed frustration about being denied disability. She denied having hallucinations. Plaintiff appeared casual and well-groomed, communicative, and cooperative. Although she demonstrated a constricted affect and underproductive speech, her speech was clear and coherent with no evidence of psychosis. Plaintiff's cognition was grossly intact, and her memory, insight, reasoning, and judgment were all good. Dr. Sanchez assessed Plaintiff with a GAF score of 55, increased Plaintiff's Prozac prescription, and prescribed Seroquel to help with Plaintiff's sleep.

By December 2013 Plaintiff appeared more spontaneous and with a
brighter affect. (R. 374–75.) She was uncertain, however, about her mood
and reported poor sleep with occasional nightmares. Plaintiff reported
being unable to purchase Seroquel. On examination, Plaintiff's cognition
appeared to be grossly intact, with good recent and remote memory, and
there was no evidence of hallucinations. Dr. Sanchez assessed Plaintiff
with a GAF score of 60, provided samples of Seroquel, and continued
Plaintiff's Prozac prescription.

Plaintiff next presented to Meridian Behavioral Healthcare
("Meridian") in June 2014 to continue with the mental healthcare she had
previously been receiving at New Horizons. (R. 400–03.) Plaintiff reported
taking Risperdal and Prozac, that she was compliant with her medications,
and that the medications worked. She also reported, however, having
auditory hallucinations upon waking or falling asleep, but that she had no
hallucinations in at least one week.

On examination Plaintiff demonstrated good eye contact, appropriate
demeanor, clear speech, and goal directed and logical thought process.
Her affect was broad, normal, and congruent with her reported mood.
Plaintiff's behavior was cooperative, her memory appeared grossly intact,
and she was oriented in four spheres. Plaintiff demonstrated appropriate

insight and judgment. Plaintiff appeared to be future oriented, as she reported being interested in day to day activities and events, that she found pleasure in daily life, and that she was hopeful about the future. Plaintiff also admitted to having close friends and denied awkwardness in interactions with others. Sanford Kaufman, M.D., noted that Plaintiff's auditory hallucinations were "not considered to be clinically significant." (R. 401.) Dr. Kaufman therefore assessed Plaintiff with depressive disorder not otherwise specified and renewed Plaintiff's Risperdal and Prozac prescriptions. (R. 402.)

By July 2014 Plaintiff was maintaining a stable level of functioning and had made fair progress toward decreasing the occurrence of auditory hallucinations. (R. 404–06.) Accordingly, Dr. Kaufman increased Plaintiff's Risperdal prescription.

In August 2014 Plaintiff reported that her medication was helping with her symptoms but that she was sleeping too much. (R. 410–12.) She had no visual hallucinations and she did not remember the last time she had any auditory hallucinations. Plaintiff demonstrated appropriate eye contact and demeanor, clear speech, goal directed and logical thought process, euthymic mood, normal affect, and intact insight and judgment. She was

cooperative, oriented in four spheres, and displayed grossly intact memory.

Dr. Kaufman noted that Plaintiff was maintaining a stable level of

functioning for a chronic condition, but decreased Plaintiff's Prozac dosage

to decrease daytime sleeping.

At her follow-up with Dr. Kaufman in October 2014, Plaintiff reported

coping well, that her mood was good, and that she had no auditory or

visual hallucinations. (R. 413–15.) Plaintiff demonstrated appropriate eye

contact and demeanor, clear speech, goal directed and logical thought

process, euthymic mood, normal affect, and intact insight and judgment.

She was cooperative, oriented in four spheres, and displayed grossly intact

memory. Dr. Kaufman noted that Plaintiff was maintaining a stable level of

functioning for a chronic condition and assessed Plaintiff as "doing well."

In December 2014, Plaintiff reported having some crying spells and

depression after having run out of her medications two days prior. (R.

416–18.) Plaintiff also said she still had auditory hallucinations even when

taking her medications. She admitted, however, that her medications were

helping with symptoms. Plaintiff demonstrated appropriate eye contact and

demeanor, clear speech, goal directed and logical thought process,

euthymic mood, normal affect, and intact insight and judgment. She was

cooperative, oriented in four spheres, and displayed grossly intact memory.
Dr. Kaufman assessed Plaintiff as maintaining a stable level of functioning
for a chronic condition. He also changed Plaintiff's medications to Latuda
and Celexa to comply with the patient financial assistance program.

When Plaintiff returned to Meridian in February 2015 she admitted
that she had not taken her new medications for two months because she
did not like the way they made her feel. (R. 379–81.) She was frustrated,
depressed, and withdrawn with crying spells. On examination Plaintiff's eye
contact and demeanor were appropriate, she had clear speech, and
demonstrated goal directed and logical thought process. Her mood was
euthymic and her affect within normal limits. Plaintiff was cooperative and
oriented. She also demonstrated grossly intact memory and appropriate
insight and judgment. Dr. Kaufman noted that despite stopping her
medications, Plaintiff was maintaining a stable level of functioning for a
chronic condition. He also gave Plaintiff a trial of Abilify.

In March 2015 Plaintiff presented to Meridian with akathisia[4] and
complaints that she could not sleep. (R. 385–87.) She reported no

---

[4] Akathisia is "[a] syndrome characterized by an inability to remain seated, with
motor restlessness and a feeling of muscular quivering; may appear as a side effect of
antipsychotic and neuroleptic medication." Stedmans Medical Dictionary 18950.

hallucinations, however. Although she demonstrated fearful behavior and symptoms of anxiety, her eye contact was appropriate, her speech normal, and her thought process and content within normal limits. Her orientation, memory, and insight appeared intact. Dr. Kaufman decreased Plaintiff's Abilify dosage and added Benadryl to Plaintiff's medication regimen.

Plaintiff returned to Meridian one week later in March 2015, reporting that she was sleepy and had been experiencing occasional auditory hallucinations. (R. 388–89.) Nevertheless, Plaintiff said that her medications were helping with her symptoms. She demonstrated appropriate eye contact, normal activity, normal thought content, and appropriate affect. Plaintiff was cooperative, but demonstrated symptoms of mild to moderate anxiety. Dr. Kaufman noted that Plaintiff's symptoms had improved. He altered her medication regimen to discontinue Risperdal, start Latuda, and decrease Benadryl.

By April 2015 Plaintiff was still sleeping poorly and had some akathisia, but no hallucinations. (R. 391–93.) On examination Plaintiff demonstrated appropriate eye contact, normal activity, normal speech, normal thought process and content, and appropriate affect. She was cooperative and displayed intact orientation, memory, and insight. Dr. Kaufman noted that Plaintiff's symptoms continued to improve. He

increased her Benadryl dosage and renewed Plaintiff's Latuda prescription.

By the end of April 2015 Plaintiff was doing "much better," felt "normal," and had no hallucinations. (R. 394–96.) She told Dr. Kaufman that her medications were working, she was coping better and sleeping normally, and had normal energy levels. Dr. Kaufman assessed Plaintiff's condition to be "much improved," and therefore renewed her medications.

Plaintiff presented to Meridian in June 2015, with complaints of restlessness and extrapyramidal symptoms. (R. 420–22.) Plaintiff's mother claimed that Plaintiff was "staring off into space during the day again." Plaintiff denied hallucinations and suicidal ideation, but the nurse practitioner's notes also indicate that Plaintiff reported auditory and visual hallucinations, as well as current suicidal ideation. Plaintiff told the nurse that she did not think her medications were helping with her symptoms. Examination revealed psychomotor agitation, guarded behavior, moderate depression, moderate anxiety, and constricted affect. She had appropriate eye contact, however, normal speech, normal thought process and content, and intact orientation, memory, insight, and judgment. The nurse assessed Plaintiff with schizoaffective disorder, bipolar type, discontinued Plaintiff's Latuda, increased her Benadryl dosage, and prescribed Haldol

and Invega.

Plaintiff returned to Meridian later that month for a follow-up with Dr. Kaufman. (R. 423–25.) Plaintiff reported feeling more comfortable on Invega and Benadryl and that her mood was good and she was coping well.

By August 2015 Plaintiff's condition had much improved. (R. 426–28.) She had no new issues and was coping well. She reported normal sleep but a decrease in energy. Plaintiff admitted that her medications were helping with symptoms and that she was taking her medications as prescribed. Plaintiff demonstrated appropriate eye contact and normal speech, activity, thought process, and thought content. Her orientation, memory, insight, and judgment were intact. Plaintiff was cooperative and her affect appropriate but constricted. Dr. Kaufman noted mild symptoms of depression and anxiety. He also noted "[n]o hallucinations reported," while also noting "[v]isual hallucinations are reported." (R. 426.) Dr. Kaufman assessed Plaintiff with schizoaffective disorder, bipolar type, but noted that Plaintiff's symptoms had improved and that she was stable and doing well. (R. 427.)

### 2.    *Physical*

Plaintiff presented to the emergency department at St. Lucie Medical Center ("St. Lucie") in November 2013 with complaints of neck pain, joint pain, and headaches following a motor vehicle accident two days prior. (R. 351–68.) Physical examination was normal. There was no evidence of trauma to her neck or head and she had no tenderness to her neck. She demonstrated full range of motion in her neck and all extremities. Imaging of her cervical spine revealed no evidence of acute abnormalities. Similarly, although imaging of her brain revealed a small meningioma in the left frontal convexity, there was no evidence of acute intracranial abnormality. Plaintiff was prescribed ultracet for pain and discharged that same day.

Imaging in December 2013 of Plaintiff's lumbar and cervical spine revealed bulging disks at the L4-L5 and L5-S1 levels, annular bulging at the C6-C7 level, and straightened alignment of the cervical spine suggesting lumbar spasm. (R. 376–78.)

In June 2014 Plaintiff denied any current physical injury. (R. 400–03.) Although she reported a history of possible neurological disorder/injury (e.g., dizziness, headache, head trauma), she admitted she never had any prior treatment for a neurological condition. She reported no disability

restrictions and denied chronic pain. Plaintiff demonstrated an unremarkable gait.

In July 2014 Plaintiff weighed 243 pounds and was measured at 5'8" in height. (R. 397–98.) Although she was overweight, her gait was unremarkable and she denied any current physical injury.

Plaintiff thereafter continued to demonstrate an unremarkable gait and deny physical injury through August 2015. (R. 379–80, 388, 391–92, 394, 410–11, 413–14, 416–17, 420–21, 423–24, 426–27.) During that time her weight fluctuated between a high of 252 pounds and a low of 221 pounds. (R. 379, 420.)

## B.    Opinion Evidence

Robin McCallister, Ph.D., and Barbara Lewis, Ph.D., both state agency psychological consultants, completed mental residual functional capacity assessments for Plaintiff on October 25, 2013, and January 13, 2014, respectively. (R. 89–92, 103–05.)

Dr. McCallister and Dr. Lewis opined that Plaintiff's ability to understand and remember detailed instructions is moderately limited, but her ability to understand and remember very short and simple instructions and her ability to remember locations and work-like procedures is not

significantly limited. She has moderately limited ability to carry out detailed

instructions, maintain attention and concentration for extended periods,

work in coordination with or in proximity to others without being distracted

by them, and complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest

periods. Yet, her ability to carry out very short and simple instructions,

perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances, sustain an ordinary routine without

special supervision, and make simple work-related decisions are not

significantly limited. Dr. McCallister and Dr. Lewis elaborated that although

Plaintiff's "conditions may contribute to some difficulties with sustained

concentration and persistence or pace," Plaintiff "may be less distracted in

situations with reduced social demands." (R. 90, 104.)

Plaintiff's ability to interact appropriately with the general public and

her ability to accept instructions and respond appropriately to criticism from

supervisors is moderately limited. However, her ability to ask simple

questions or request assistance, ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes, and her

ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness is not significantly limited. Dr. McCallister and Dr. Lewis further noted that Plaintiff "may have reduced tolerance for social engagement and critical feedback and may function best with low social demand settings and non-confrontational supervision." (R. 91, 104–05.)

Finally, with respect to adaptation limitations, Dr. McCallister and Dr. Lewis opined that while Plaintiff has a moderately limited ability to respond appropriately to changes in the work setting, she is not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others. Thus, Dr. McCallister and Dr. Lewis proffered that Plaintiff "may benefit from a more predictable routine work environment." (R. 91, 105.)

## C.   Hearing Testimony

At the hearing before the ALJ on October 15, 2015, Plaintiff testified that although she was thirty years old she had never worked, did not know why she never worked, and did not know how she supported herself. (R. 42.) She lived with her mother in an apartment that her mother paid for. (R.

42–43.) Plaintiff's mother did not work and was on disability. (R. 50–51.)

Plaintiff said she was being treated at Meridian for her depression, but she did not remember how long she had been going there, when she went last, or what kind of problem she had with her memory. (R. 43.) She did not know the name of her doctor at Meridian and did not know how long her appointments lasted. (R. 44.) She did not know how long she had been depressed or what made her depressed. (R. 44–46.) She was taking medication to help with her emotions, which were helping. (R. 46–48.) She did not need anyone to remind her to take her medications. (R. 46.) She would often get distracted, however, and forget what she was previously doing. (R. 55–56, 61.)

Plaintiff's back and neck still bothered her from the vehicle accident. (R. 60.) She had pain if she bended down for too long. She also had poor circulation in her legs, which made her legs go numb after sitting for too long, when sitting in an awkward position, or after standing for too long.(R. 61–62.)

Plaintiff helped her mother with household chores, such as washing dishes, vacuuming, and laundry. (R. 51.) Sometimes she also went shopping with her mother. During the day she read romance novels or

watched cartoons or horror movies on television. (R. 52–53.) She did not

remember, however, the last time she read a romance novels. (R. 53.)

Plaintiff also liked to draw and do arts and crafts. (R. 53.)

Plaintiff did not have any friends and only went outside once in a

while. (R. 56.) She did not like being around people she did not know

because they made her nervous. (R. 57.)

Plaintiff's mother also testified at the hearing. (R. 63.) Her mother

testified that depending on the day, if she did not remind Plaintiff what to

do Plaintiff would "just stall and just sit there like she couldn't pick out what

she want[ed] to do next." (R. 64–65.) Her mother had to remind Plaintiff

about activities of daily living three or four times a week. (R. 65.) When

Plaintiff had a bad day she would stay to herself and did not want to be

around anyone. Plaintiff's new medications, however, seemed to be

working better.

Although Plaintiff had a learning disorder throughout school, Plaintiff

was never diagnosed with a specific condition. (R. 66–67.) Plaintiff would

not be able to do simple, unskilled tasks at a job because she did not have

very much concentration. (R. 67.) Plaintiff also would not be able to deal

with crowds or with a supervisor telling her what to do. (R. 69.) Plaintiff's

mother never considered bringing Plaintiff to the Florida Division of Vocational Rehabilitation so that Plaintiff could be trained to do work.

A vocational expert, Jewel E.B. Euto ("VE"), also testified at the hearing. (R. 70.) The VE testified that a claimant of Plaintiff's age, with marginal education, no past relevant work, and Plaintiff's RFC[5] could perform jobs as a laundry laborer, cutter II, laundry folder, cleaner/polisher, and stubber, all of which existed in significant numbers in the national economy. (R. 73–75.) A person performing those jobs could be off-task for at most ten percent of the workday. (R. 77.)

## D.   The ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 25, 2013, the application date. (R. 22.) In terms of severe impairments, the ALJ found that Plaintiff has a history of learning

---

[5] The claimant could do a wide range of work up to at least the medium work level. There are no limitations with regard to her ability to sit, stand, walk, lift, or carry. There are no significant postural, manipulative, communicative, or environmental limitations. The claimant can, in the course of a normal workday, perform simple, rote, an repetitive tasks in response to primarily oral directives in a work setting that does not materially change from one day to the next. The claimant should have no interaction with the general public and occasional or less interaction with coworkers and supervisors. The claimant should not have any job that requires her to meet any kind of strict production goal or quotas. She would tend to do better in a job that has her dealing with things as opposed to other people. The claimant should not have a job that requires her to interact with another co-worker in order to accomplish work during the course of a normal workday. (R. 72–73.)

disorder, obesity, and depressive disorder not otherwise specified. At step

three, however, the ALJ did not find that any of the impairments or

combination of impairments met or medically equaled the severity of one of

the listed impairments.

At step four the ALJ found that Plaintiff has the residual functional

capacity ("RFC") to perform medium work as defined in 20 C.F.R. §

416.967(c), with additional limitations. (R. 24.) The ALJ further determined

that Plaintiff has no past relevant work. (R. 31.)

At step five, however, based on Plaintiff's age, education, and RFC,

the ALJ found there are jobs that exist in significant numbers in the

national economy Plaintiff can perform. Accordingly, the ALJ determined

Plaintiff has not been under a disability from July 25, 2013, through the

date of the ALJ's decision. (R. 32.)

## IV.  DISCUSSION

Plaintiff's sole argument on appeal is that substantial evidence does

not support the ALJ's RFC determination. (ECF No. 26.)

A claimant's RFC is the most a claimant can do, despite her

limitations. 20 C.F.R. § 416.945(a)(1). The RFC is based, not only on

medical opinions, but also on the ALJ's review of all relevant evidence in the record. *Id.*; 20 C.F.R. § 416.946.

The ALJ determined that Plaintiff has the RFC to perform medium work, with the following additional limitations:

> She can perform simple, rote and repetitive job tasks. She can respond to oral directives. She can perform work tasks in a work setting where the job duties do not change from one day to the next. She should not have any interaction with the general public but she can interact with coworkers and supervisors occasionally. She cannot meet any strict production goals or quotas. She tends to do better dealing with things rather than with people. She should not have to interact with another coworker to accomplish her work duties.

(R. 24.)

Under SSR 83-10, "medium work" is defined as:

> lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and

forward by bending the spine at the waist.) Flexibility of the knees
as well as the torso is important for this activity. (Crouching is
bending both the legs and spine in order to bend the body
downward and forward.) However, there are a relatively few
occupations in the national economy which require exertion in
terms of weights that must be lifted at times (or involve equivalent
exertion in pushing or pulling), but are performed primarily in a
sitting position, e.g., taxi driver, bus driver, and tank-truck driver
(semiskilled jobs). In most medium jobs, being on one's feet for
most of the workday is critical. Being able to do frequent lifting or
carrying of objects weighing up to 25 pounds is often more critical
than being able to lift up to 50 pounds at a time.

Substantial evidence supports the ALJ's determination that Plaintiff

has the RFC to perform medium work with additional limitations.

As an initial matter, the ALJ found that while Plaintiff's "medically

determinable impairments could reasonably be expected to cause some of

the alleged symptoms," Plaintiff's "statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely credible

. . . ." (R. 25.) The only reference to credibility in Plaintiff's memorandum is

her general assertion that she,

> should have been found disabled . . . because it is entirely
> *credible* that as a direct and proximate result of her
> combination of impairments, to wit: barely borderline IQ;
> depression and anxiety[,] she cannot productively be present
> and function in the workplace eight (8) hours a day five (5) days
> a week, for an entire month because she would have too much
> nonproductive time . . . to meet the productively expectations of

an employer, other than in a sheltered work setting.

(ECF No. 26 at 26) (emphasis added). Plaintiff does not expound on the

issue of credibility, however, nor does she otherwise argue that the ALJ

erred in determining that Plaintiff was not entirely credible.

> To preserve an issue for appeal, the party must raise the
> "specific issue to the district court" so that the district court has
> "an opportunity to consider the issue and rule on it." *Jones v.
> Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). Generally, this
> means that the issue must be plainly and prominently raised,
> with supporting arguments and citations to the evidence and to
> relevant authority. *Sapuppo v. Allstate Floridian Ins. Co.*, 739
> F.3d 678, 681 (11th Cir. 2014).

*Morrison v. Comm'r of Soc. Sec.*, 660 F. App'x 829, 832 (11th Cir. 2016)

Merely mentioning, in a cursory manner, that it was not credible to

conclude Plaintiff could not productively be present and function in the

workplace eight hours a day five days a week does not properly develop an

issue for the Court to review and rule upon. Plaintiff has therefore waived

any argument pertaining to the ALJ's credibility finding.

Contrary to Plaintiff's argument the ALJ thoroughly discussed

substantial objective medical evidence that supported his RFC

determination. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir.

2005) ("[T]here is no rigid requirement that the ALJ specifically refer to

every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole."). A lack of medical reports indicating exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations).

With respect to Plaintiff's physical health, the ALJ noted that although Plaintiff has an annular bulge at C6-C7 and two bulging disks in her lumbar spine, there is no evidence of any neurological impingement or compromise. None of Plaintiff's physical examinations suggested that she had any neurological or other physical problems. In addition, despite Plaintiff's history of obesity, Plaintiff repeatedly demonstrated an unremarkable gait. Notably, none of Plaintiff's medical providers ever suggested that Plaintiff's annular bulge, bulging disks, or obesity imposed any significant physical functional limitations.

With respect to Plaintiff's mental health, specifically the alleged

hallucinations, the ALJ pointed out that Plaintiff repeatedly denied having any hallucinations between June 2013 and December 2013. Then, several months after her application for SSI was denied on January 13, 2014, Plaintiff began reporting auditory hallucinations.

The ALJ further pointed out that although Dr. Kaufman eventually changed Plaintiff's diagnosis to a schizoaffective disorder (despite a prior notation that Plaintiff's hallucinations were "not considered to be clinically significant") some of Dr. Kaufman's records are internally inconsistent as they indicate both that hallucinations were and were not reported. Nevertheless, the ALJ found Plaintiff's subjective complaints and reports of hallucinations not entirely credible because they were inconsistent with Plaintiff's many statements to the contrary, as well as for the other reasons explained in the ALJ's decision. An independent review of the record also reveals that Plaintiff's alleged hallucinations occurred upon waking and falling asleep—not during the day and therefore would not distract her from daily activities.

The ALJ also thoroughly discussed progress notes between July 2013 and August 2015 pertaining to Plaintiff's depression and anxiety. (R. 25–27.) Although the progress notes disclose there were occasions where

Plaintiff demonstrated symptoms of depression or anxiety, constricted affect, or decreased speech, the notes reflect that Plaintiff's affect was predominantly within normal limits and she usually demonstrated clear speech. Her thought process and thought content repeatedly were within normal limits. She was consistently oriented and cooperative. Plaintiff consistently demonstrated normal behavior and appropriate eye contact. She also consistently demonstrated intact insight and judgment. Similarly, despite Plaintiff's allegations of having problems with her memory—which the ALJ found not entirely credible—and despite Dr. Beltran's finding that Plaintiff had some memory deficits, examinations in November and December 2013, June, August, October and December 2014, and February, March, April, June, and August 2015 all evidenced that Plaintiff's memory was intact.

Moreover, Plaintiff constently reported that her medications were helping control her symptoms. On the few occasions where she had complaints about her medications, the ALJ pointed out that her complaints were inconsistent with prior reports to the same physicians. Nevertheless, an independent review of the record reveals that Plaintiff responded favorably to alterations to her medication regimen which adequately

addressed any issues that arose.

In sum, there is no objective medical evidence suggesting that Plaintiff could not perform medium work with the additional limitations set forth in the RFC, or that Plaintiff had a disabling condition that had lasted or could be expected to last for a continuous period of at least twelve months. *See* 42 U.S.C. §§ 416(I), 423(d)(1)(A).

The ALJ also considered opinion evidence in determining Plaintiff's RFC. *See* 20 C.F.R. § 416.929(c)(1) (explaining that in evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions"). The ALJ throughly discussed each piece of opinion evidence in the record, assigned each opinion weight, and explained his reasons for doing so. (R. 27–29.) Plaintiff does not challenge the weight assigned to these opinions and has therefore waived any argument pertaining to weight assigned to the opinions.

The ALJ further noted that no mental health professional has ever opined that Plaintiff is disabled or otherwise has work preclusive limitations. (R. 30.) The record further demonstrates that Plaintiff received

medication management services, was never referred for counseling or inpatient treatment, and was never the subject of a Baker Act petition. (*Id.*)

Finally, the ALJ pointed out that while Plaintiff claimed to not know the answer to many basic questions at the hearing, she did know that her mother is on disability. (*Id.*) The ALJ also noted that Plaintiff had never even attempted to work or participate in vocational rehabilitation or job training, and that Plaintiff's mother told a nurse practitioner in June 2013 that she wanted disability for Plaintiff. (*Id.*) These facts suggest that Plaintiff is *unmotivated* to work, as opposed to being *unable* to work.

Although Plaintiff argues that she could not work full time because she would be off-task and have too much nonproductive time during the course of the workday and workweek, Plaintiff fails to point to any objective medical records to support that assertion and instead merely relies upon the subjective statements of Plaintiff and her mother. The ALJ, however, found Plaintiff was not entirely credible and, as explained, also determined that Plaintiff's objective medical records did not support the alleged problems pertaining to Plaintiff's concentration and memory. Although the record does evidence some limitations regarding Plaintiff's concentration and memory, the ALJ took these limitations into consideration in

formulating Plaintiff's RFC. Substantial evidence supports the ALJ's RFC determination. The ALJ's decision should therefore be affirmed.

## V.  RECOMMENDATION

In light of the foregoing it is **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** at Gainesville, Florida this 7th day of February 2018.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**